UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

ADRIANT COLEMAN,

                              Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

                              Defendant.

Civ. No. 12-5783 (KM)

OPINION

**KEVIN MCNULTY, U.S.D.J.:**

      The plaintiff, Adriant Coleman, is a 47-year-old man who suffers from bipolar disorder, which appears to greatly inhibit his functional capacity. Plaintiff applied for disability insurance benefits and supplemental security insurance benefits in March 2009 but Defendant Commissioner of Social Security denied his application, as well as a follow-up application for reconsideration. Administrative Law Judge James Andres ("the ALJ") affirmed Defendant's denial in January 2011, and the Appeals Council affirmed Andres' decision in July 2012, rendering it a final decision of the agency. The central issue in dispute is whether Plaintiff's symptoms render him unable to work.

      In this action brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), Plaintiff claims that the agency's decision should be reversed or remanded for further consideration. As explained below, I find that the record does not contain substantial evidence to support several of the findings on which this denial of benefits was based, and further find that the ALJ arrived at his decision without a legally sufficient analysis in certain respects. I will therefore **REMAND** this case for a new hearing consistent with the findings of this opinion.

    **I.**    **BACKGROUND**

      Plaintiff has received several diagnoses of bipolar disorder and has been hospitalized on several occasions amid what appear to be psychological breakdowns. He has, generally speaking, been stabilized thanks to an aggressive drug treatment and therapy plan administered by his treating psychologist. He states that he has been disabled since December 1, 2006, and has not worked since then, except for a short stint in 2008.

### *The Administrative Decision Under Review*

Plaintiff received a 17-minute hearing before the ALJ in December 2010 (ECF No. 7-2 at pp. 24-39). Based on that hearing and exhibits in the administrative record, the ALJ rendered a 9-page decision finding Mr. Coleman not disabled, and therefore not eligible for the benefits sought. (Decision [ECF No. 7-2] at pp. 12-20).

The issue, as the ALJ set forth, is whether Mr. Coleman is "disabled," that is to say, suffering from an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416. *See also* 42 U.S.C. 423(d). The test for determining whether an individual is disabled is a five-step sequential evaluation process, codified at 20 CFR 404.1520(a) and 416.920(a).

The first step asks whether the applicant is "doing substantial gainful activity," i.e., work for pay or profit. 20 CFR 404.1520(a)(4)(i), 404.1572. The analysis proceeds to step two only if the applicant is not engaging in such activity. The ALJ found that Mr. Coleman was not engaged in such substantial activity at any time following the period of alleged onset of disability. (Decision at p. 3); *see* 20 CFR 404.1520(a)(4)(i); 404.1572.

The second step asks whether the claimant has a medically determinable impairment or combination of impairments that is "severe," and expected to last for a continuous period of 12 months. *Id.* at 404.1520(a)(4)(ii); 405.1509. The analysis proceeds to step three only if the requisite severity is shown. Here, the ALJ found that the evidence established that Mr. Coleman had the impairment of bipolar disorder and that this impairment is "severe" within the meaning of the regulations "because it causes significant limitation in the claimant's ability to perform basic work activities." (Decision at p. 3 (citing 20 CFR 416.920(c))).

The third step asks whether the claimant's impairments or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1, as well as the duration requirement of 20 CFR 404.1509 (requiring impaired to "be expected to last for a continuous period of at least 12 months"). If there in an affirmative finding at step three, then the claimant is "disabled." If not, then the analysis proceeds to step four. Here, the ALJ found that Mr. Coleman did not satisfy the "paragraph B" criteria of listing 12.04 of the Appendix (affective disorders), deeming Mr. Coleman's restrictions "moderate" and not "marked." He wrote two paragraphs of analysis in this regard. He also found that Mr. Coleman could not satisfy the "paragraph C" criteria, writing one paragraph on this topic. (*See id.* at p. 4).

Accordingly, the ALJ conducted the fourth step, which asks for a determination of "the claimant's residual functional capacity": the claimant's "ability to do physical and mental work activities on a sustained basis despite limitations from his impairments (both severe and non-severe)." As part of step four, the ALJ is then to determine whether the claimant has the residual functional capacity (RFC) to perform the requirements of his past work (spanning the last 15 years), either as he actually performed it or as it is generally performed in the national economy. If the claimant has the RFC to do his past relevant work, he is not disabled and the analysis ends. If the applicant is unable to do any of his past relevant work or has no such work, the analysis proceeds to step five. Here, the ALJ announced that "claimant has the [RFC] to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is able to maintain pace, persistence, and concentration in simple routine tasks and is able to relate appropriately to coworkers and the public." (*Id.* at p. 5). The ALJ explained that while Mr. Coleman's alleged symptoms could certain arise from his impairment, Mr. Coleman's statements regarding the intensity and persistence of those symptoms were not credible. (*Id.*). To further support his finding as to Plaintiff's RFC, the ALJ accepted certain portions of the medical input in the record, while rejecting others. (*Id.* at p. 7). Finally, and crucially, the ALJ found Coleman "capable of performing" his past relevant work as a crane operator and laborer, as this work "does not require the performance of work-related activities precluded by the claimant's [RFC]." (*Id.*). The ALJ, however, limited his analysis to the "physical demands of this work." (*Id.*).

A step four finding that the applicant is not disabled is sufficient to conclude the analysis. Here, however, the ALJ nevertheless continued to Step 5 and found, in the alternative that Mr. Coleman, given his RFC, can perform other work that exists in the national economy. (*Id.* at p. 8 (citing 20 CFR 404.1569, 416.969)).

### *Plaintiff's Contentions*

On this appeal, Mr. Coleman objects to the following steps of the ALJ's sequential analysis:

- Step Two, claiming that the ALJ should have found schizophrenia to be an additional impairment;

- Step Three, claiming that the ALJ's analysis and conclusion under listing 12.04 ran counter to the evidence, and that the ALJ should have also analyzed Mr. Coleman's impairment under listing 12.03 (schizophrenia).

- Step Four, complaining that there is insufficient explanation and evidence to support the conclusion that Mr. Coleman has "no problems" with persistence, concentration, and pace, so

3

    long as his tasks are simple and routine, and that Mr. Coleman can relate appropriately to coworkers and the public. He also complains that his past job should not have been labeled "general laborer," as there is no evidence of this. Finally, he contests the finding that plaintiff could work as a crane operator again, and that this job entailed simple, routine tasks.

- Step Five, complaining that this finding, too, is not supported by substantial evidence.

  I will affirm the ALJ's Step One finding. As to Step Two, because I am remanding for other reasons, I will request clarification. I find merit in Plaintiff's contentions regarding Steps Three, Four, and Five. As to those, I will reverse several of the ALJ's findings and remand for a new hearing.

## II. STANDARD OF REVIEW AND POTENTIAL REMEDIES

  For the purpose of this appeal, the Court conducts a plenary review of the legal issues. *See Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999). The factual findings of the ALJ are reviewed "only to determine whether the administrative record contains <u>substantial evidence</u> supporting the findings." *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000)(emphasis added). Substantial evidence is "less than a preponderance of the evidence but more than a mere scintilla." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (citation omitted). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* When substantial evidence exists to support the ALJ's factual findings, this Court must abide by the ALJ's determinations. *See id.* (citing 42 U.S.C. § 405(g)).

  A district court, after reviewing the decision of the Secretary may, under 42 U.S.C. § 405(g) affirm, modify, or reverse the Secretary's decision with or without a remand to the Secretary for a rehearing. *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984); *Bordes v. Commissioner*, 235 Fed. App'x 853, 865-66 (3d Cir. 2007).

  Outright reversal with an awarding of benefits is appropriate "only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny*, 745 F.2d at 221-222; *Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000)(citing *Podedworny*); *see also Bantleon v. Comm'r of Soc. Sec.*, 2010 U.S. Dist. LEXIS 99537, *38-39 (D.N.J. 2010). Thus, if the ALJ's findings are not supported by the substantial evidence, **and** the record is fully developed, with substantial evidence sufficient to establish disability, then the District Court should reverse and find in the claimant's favor. *See, e.g., Morales* at 320. When the petitioner has faced long delays, the courts tend to take a liberal approach in determining whether the record is sufficiently developed. *See id.; Bantleon* at *38-39.

Remand is proper if the Court if the record is incomplete or lacks substantial evidence sufficient to find that claimant disabled or not disabled under the five step inquiry. *See Podedworny* 745 F.2d at 221-222. It is also proper where the ALJ's findings are not the product of a complete review of the record evidence which "'explicitly' weigh[s] all relevant, probative and available evidence." *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994). Indeed, the Commissioner "must provide some explanation for a rejection of probative evidence which would suggest a contrary disposition." *Id.* Though she "may properly accept some parts of the medical evidence and reject other parts, she must consider all the evidence and give some reason for discounting the evidence she rejects." *Id.* Along similar lines, "[t]he ALJ must review all the medical findings and other evidence presented in support of a treating physician's report against the reports submitted by other physicians who have examined the claimant." *Id.* at 47-48. The ALJ may not ignore a treating physician's opinion; to the contrary, they must give it controlling weight if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 CFR 404.1527(c)(2). If the ALJ does not ascribe controlling weight, he or she must nonetheless "pay close attention to the medical findings of a treating physician," *Bordes v. Commissioner*, 235 Fed. App'x at 864 (quoting *Brewster v. Heckler,* 786 F.2d 581, 584 (3d Cir. 1986)), and must express why he or she rejects any of those findings—they may not be simply ignored. *Id.; see Adorno* at 48.

## ANALYSIS

### *Steps One and Two*

At Step One, the ALJ found that Mr. Coleman has not engaged in "substantial gainful activity" since December 1, 2006, the date upon which he contends he became disabled. Such a finding is the first step towards a disability finding, permitting the sequential analysis to proceed to Step Two. *See* 20 CFR 404.1520(a). Naturally, Plaintiff does not challenge this finding. It is supported by substantial evidence, and I see no reason to upset it.

At Step Two, the ALJ found, based on medical evidence in the record, that Mr. Coleman "has the following severe impairment: bipolar disorder." (Decision at p. 3). Although this suffices to move Plaintiff on to Step Three, it constricts the Step Three analysis to the listed factors pertaining to bipolar disorder. Plaintiff's gripe is that the ALJ did not also find that he suffers from the impairment of schizophrenia. (*See* Pltf's Br. at 14). Had the ALJ found this, the Step Three analysis would necessarily have considered whether plaintiff's impairment meets the severity factors pertaining to schizophrenia. Thus, says Plaintiff, this error "renders all other subsequent findings void." (*Id.*).

There is substantial evidence that would support the ALJ's decision *not* to include schizophrenia at Step Two. Because I am remanding for other

5

reasons, however, I will request that the ALJ—assuming that he adheres to his rejection of schizophrenia as a second impairment—to clarify his basis for rejecting certain evidence.

Plaintiff points to the few facts in the record that support his view. He states that he suffers from "simple" schizophrenia, or, alternatively, bipolar disorder ("manic, with psychotic features"), based on the "assessments of psychiatrists, both treating and consulting, from physicians in psychiatric hospitals and from psychiatrists engaged by the commissioner..." (*Id.* at 2-3). He points to the diagnosis by the psychologist hired by Defendant to examine him in July 2009, who stated "diagnosis: schizophrenia, simple type, unspecified[.]" (*Id.* at 4 (citing Administrative Record ("Record") [ECF No. 7-7] at 212-216). The Commissioner's psychologist, Dr. Ronald Silikovitz, performed an independent evaluation and did indeed record his conclusion that Plaintiff suffered from both schizophrenia and "bipolar disorder, mixed, moderate to severe, with psychotic features." (Record at 215). The ALJ relied on some parts of Silikovitz's evaluation elsewhere in his decision, but did not discuss Silikovitz's diagnosis of schizophrenia.

Were I not remanding for other reasons, I would probably uphold the ALJ's determination as to Step Two. Although the failure to acknowledge and explicitly reject contrary evidence is always problematic, in this context I find that the weight of the substantial evidence supports the ALJ's finding of a single impairment, and tends to suggest that Silikovitz's diagnosis of schizophrenia is an outlier. The issue is simply what medically determinable medical impairments Mr. Coleman has that are expected to last at least one year into the future. *See* 20 CFR 404.1520(a)(4)(ii); 405.1509. The psychiatrist who treats Mr. Coleman on a regular basis reported, in October 2010, after over three years of treating Mr. Coleman, that "Mr. Coleman is diagnosed with bipolar disorder and polysubstance dependence in full remission." (Letter of Saul Gorman, M.D., (Record at 262)). Other contemporaneous notes of Dr. Gorman from 2010— the most recent available medical records—consistently contained the same note. (Psychiatric Drug Management Notes of 4/20/10, 8/13/10, 11/5/10 (Record at 261, 264)). There is one official form on which Dr. Gorman wrote "schizoaffective disorder" as his diagnosis (Examination Report of 11/17/2009 (Record at 268)), but this was followed by more recent records omitting any such diagnosis and reporting "no psychosis." (*See* Management Notes of 11/16/09, 1/26/10, 4/20/10, 8/13/10, and 11/5/10 (Record at 261, 264, 266)). Even going back to the earliest medical records available, from a 10-day hospital stint upon significant decompensation in early 2006, the diagnosis made no mention of schizophrenia, but rather reported: "bipolar disorder, manic, with psychotic features." (Discharge Summary of 1/16/06 (Record at 161-162)).

The line between schizophrenia and bipolar disorder may be fine, but can certainly be understood by a psychiatrist who has an ongoing relationship with

6

a patient. The weight of the evidence, particularly the succession of Mr. Gorman's well-developed diagnosis in late 2010 to an earlier diagnosis of Dr. Silikovitz, who met Plaintiff once, is substantially in support of the ALJ's finding that bipolar disorder is plaintiff's *only* severe impairment.

Plaintiff quotes law about the liberal standard for a finding that impairment(s) are "severe." These cases address the *severity* standard and *not* the standard for what underlying impairments ought to be included. See *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360-361 (3d Cir. 2004). Plaintiff's contention in this regard would not, therefore, affect my review.

As I say, however, there is no need to reconstruct what the analysis should or might have been, as I have determined that the matter should be remanded. On remand, the ALJ should discuss and deal with Silikovitz's diagnoses of "schizophrenia, simple type, unspecified" in addition to "bipolar disorder, mixed, moderate to severe, with psychotic features." (Record at 212-16).

***Step Three***

At Step Three, the ALJ conducted the required severity analysis, in which evidence of Plaintiff's impairment is compared to the pertinent descriptive listings in Appendix 1 to Subpart P of 20 CFR part 404. If the impairment evidence aligns with the descriptions in one or more of those listings, then the claimant is to be found disabled, without any need to continue to Steps Four or Five. 20 CFR 404.1520(a)(4)(iii). The ALJ compared the impairment evidence to listing 12.04, and found that Plaintiff's symptoms did not match that listing's criteria.

Plaintiff complains that 1) because schizophrenia should have been found as an impairment at Step 2, at Step 3 the ALJ should have also considered the factors contained in the listing pertaining to schizophrenia; and 2) the ALJ erroneously failed to consider contrary evidence and arrived at a decision that lacks substantial evidence to support it. The first contention, relating to Step 2, depends on whether on remand the ALJ adheres to his prior analysis, which may or may not occur. I therefore do not consider it. I find considerable merit, however, in Plaintiff's second argument.

20 CFR Part 404 Appendix 1, at listing 12.04, states that an "affective disorder," such as bipolar disorder, has the "required level of severity" to be considered a disability "when the requirements in both [part] A and [part] B [of the listing] are satisfied, or when the requirements in [part] C are satisfied."

Part A can be satisfied by evidence of "bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes)." *Id.* The ALJ appears to have implicitly found this, as he did not

7

conduct any analysis under part A, but moved directly into analyzing the Part B indicia. It appears that there would be substantial evidence to support a positive finding as to part A.

Part B asks whether the evidence shows that the claimant's impairment

"Result[s] in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration."

*Id.* The ALJ found that the evidence did not satisfy any of these criteria. He also found that Plaintiff's impairment did not meet the Part C criteria. Plaintiff only challenges the ALJ's assessment of the Part B criteria. Accordingly, I will assess the evidence, and the quality of the ALJ's analysis, as to each of the four Part B prongs.

### 1. *Marked restriction of activities of daily living*

A claimant suffers a "marked" restriction when the limitation is "more than moderate but less than extreme." 20 CFR Part 404 Appendix 1 to Subpart P at 12.00(C). The same regulation goes on to explain that: "[a] marked limitation may arise when several activities or functions are impaired, or even when only one is impaired." The key fact is not the number of activities that are impaired, but the "nature and overall degree of interference with function." The regulation continues: "Activities of daily living include adaptive activities such as cleaning, shopping, cooking, talking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." *Id.* A marked restriction may exist despite the claimant's being able to do any of the above activities, if the claimant has "serious difficulty performing them without direct supervision, or in a suitable manner, or on a consistent, useful, routine basis, or without undue interruptions or distractions." *Id.*

The ALJ found only a "moderate restriction" in Mr. Coleman's activities of daily living. His sole stated reason was that "claimant indicated that he was able to address his personal care, do laundry and go shopping." (Decision at p. 4 (citing Exh. 6E at p. 2-4)). The ALJ provides no further analysis or any other citation to the record evidence. There are numerous problems with this finding.

8

First, the finding appears contrary to law. The ALJ's statement of reasons, and the evidence he cited, do not support a negative finding, given the factors pertinent to this prong. The regulations require assessment of whether the claimant can conduct certain activities on a "consistent, useful, routine basis, or without undue interruptions or distractions." Appendix 1 at 12.00(C). The ALJ did not (or at least did not explicitly) assess the evidence in light of that standard. The decision contains a finding as to a few activities that Plaintiff said he is *able* to do; it does not contain an assessment of whether the Plaintiff actually does these things consistently and routinely and/or without undue interruption or distraction. Further, the regulations require assessment of the *overall* degree of interference, across a broad spectrum of activities. The ALJ decision's terse analysis was limited to three narrow activities.

Second, there is substantial contrary medical evidence that the ALJ decision fails to discuss. I point to the following examples:

> -Coleman received GAF scores on various occasions: on 2/16/07, a score of 50 (East Orange General Hospital Discharge Transfer Summary of Dr. D. Shah (Record at 197)); on 2/22/07, a score of 43 (DSM IV Multiaxial Evaluation of Thomas Rohde, M.D. 2/22/07 (Part of bipolar II diagnosis) (Record at 185)); on 6/1/07, a score of 58 (Intake Assessment of Illegible Staff Member at Trinitas Hospital); and on 7/9/09, a score of 37 (Independent Psychological Evaluation of Ronald G. Silikovitz (Record at 216)). A GAF of 60 or below indicates moderate symptoms or moderate difficulty in social or occupational functioning; A GAF of 50 or below represents a serious impairment in functioning; a GAF of 40 or below represents s "major impairment" in several areas or impairment in reality testing or communication.[1]

> -Coleman, for his part, has stated: "I can't concentrate and keep at a simple job to completion. And I lose interest in anything that I start to do. I am distracted by voices that I hear." (Request for Reconsideration, 8/3/09 (Record at 51)). He also reported that he

---

[1] *Horst v. Comm'r of Soc. Sec.*, 2014 U.S. App. LEXIS 307 at *4 n.3 (3d Cir. Jan. 8, 2014)("'GAF' stands for 'Global Assessment of Functioning;' which is a numeric rating used by mental health practitioners to measure the functional impairment of a patient on a 0-100 scale in accordance with the Diagnostic and Statistical Manual of Mental Disorders. A score of 40 represents '[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work...)" (citing *Funk v. CIGNA Group Ins.*, 648 F.3d 182, 186 n.6 (3d Cir. 2011) (*quoting* Am. Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed., 2000) ("DSM-IV")))).

9

did not have a bank account. (Application Summary (Record at 96)).

-Coleman also stated, contrary to the ALJ's findings, that "I do not do any shopping. I try to keep my kids in order. I do not dress them...I am sleep less...I do not have any interests or hobbies." (Disability Report submitted by Pltf 9/29/09 (Record at 135)). He has characterized his daily activities from the time he wakes until he goes to bed as "watch TV pray contemplate." (Function Report – Adult, How your illnesses, injuries or conditions limit your activities (Record at 149)). On the same form, he reported that he "don't care" about how he dresses, "go[es] two months without hair care," has a "loss of appetite," and a "loss of respect for self and others." (*Id.* (Record at 150)). He further reported that he required special reminders to "be more mindful [of his] appearance and hygiene." (*Id.* (Record at 151)). In addition, he "never" prepares food or meals, does not know how to cook, does not do house or yard work because he's "stubborn [and] rebelling," and reports only "handwashing clothes" for "40 min, 2 a month" as a household chore that he completes. (*Id.*). Next, he reported going outside 3 to 4 times per week, and being unable to drive (no license) and not using public transportation. (*Id.* (Record at 151-52)). Coleman stated that he only goes to the store for cigarettes and soda, which takes no longer than 25 minutes; that he is not able to pay bills, handle savings, or use a checkbook; that he "never had bills of own or paid bills;" that his hobbies are "TV and people staring;" and that his illness affects his ability to complete tasks and follow instructions. (*Id.* (Record at 152-53).

-Dr. Silikovitz, in his July 2009 evaluation, reported that Mr. Coleman "sweeps, makes up the beds, and helps with the cleaning," though Coleman said his "woman does all of the cooking and cleaning and laundry," and his day consists of sometimes helping the kids get ready for school, sitting on the porch smoking, picking the kids up from day care, sometimes visiting his brothers in Newark, sometimes talking to neighbors or napping, and listening to music. (Record at 215). Silikovitz opined that Coleman was "capable of managing his own funds[,]" but assessed Mr. Coleman's GAF score at a paltry 37. (*Id.* at 216).

-Frances Hecker, Ph.D examined Coleman on August 6. 2009 and found "moderate" but not "marked" restriction of Coleman's activities of daily living. She did not explain her reasoning, and the only detailed facts she noted were that Mr. Coleman "performs household chores and helps out with his children." (Psychiatric Review Technique of 8/6/09 (Record at 219-222, 225)).

10

-Dr. Gorman, Coleman's long-term treating psychiatrist, stated in Fall 2010 that Coleman "is stable on [a] treatment regime" featuring "Benadryl, celexa, Haldol, and lithium carbonate," but that "Mr. Coleman is unable to work on a regular basis due to his mental health disability." (Record at 262).

The single piece of evidence on which the ALJ bases his linchpin conclusion that the claimant is able to "address his personal care, do laundry, and go shopping" does not fully support that assertion. Plaintiff says nothing about his personal care, and states only that he shops for soda and cigarettes, and hand-washes his clothes twice a month. The remainder of his Disability report is a portrait of a man unable to take care of himself. Thus, the one document cited by the ALJ actually appears to depict a marked restriction in Plaintiff's activities of daily living.

Turning to the rest of the evidence, all but one of Plaintiff's GAF scores reaffirm the notion that Coleman functions at a very low level, and the input of Coleman's treating psychologist, Dr. Gorman, is that Coleman is unable to work and is stable only as a result of a heavy regimen of drugs and therapy. The only medical evidence that tends to support the ALJ's finding is Dr. Hecker's summary conclusions—devoid of any discussion or rationale and based only on a review of documents—and the highest GAF score, of 58, rendered by an unknown clinician upon a 2007 intake of Coleman at Trinitas Hospital. This record evidence arises from second hand assessment and/or from a single interaction with the Plaintiff, as compared to Dr. Gorman's extensive course of treatment.

I do not consider Dr. Hecker's form diagnosis, which came up one box short of "marked restriction," or the outlier GAF score from 2007, to be substantial evidence that Coleman's restriction is not marked. All other things being equal, I would not reverse or remand merely because I disagreed with the weight the ALJ gave a piece of evidence. But I must be satisfied that such weighing took place. In the context of the whole record, these documents may not amount to more than a scintilla.

Finally, I must note that the ALJ decision fails to discuss or give reasons for the rejection of the contrary evidence set forth above, including a treating physician's statements. This incomplete review constitutes error and furnishes an independent basis for remand. *See Adorno v. Shalala*, 40 F.3d at 48; *Bordes v. Commissioner*, 235 Fed. App'x at 864.

In sum, the ALJ decision's first prong analysis is incomplete and therefore erroneous, and the substantial evidence in the record does not support his finding.

### *2. Marked difficulties in maintaining social functioning*

Social functioning refers to an applicant's "capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals." Appendix 1 at 12.00(C)(2). It means being able to get along with others, from close family to those seen in the brief interactions of daily life (like a bus driver). *Id.* Examples of impaired functioning include altercations, firings, evictions, fear of strangers or avoidance of relationships, or social isolation. Examples of unimpaired or less impaired functioning include initiating social contacts, communicating clearly, or actively participating in groups, as well as signs of cooperation, consideration, and social maturity. *Id.* Whether the difficulty is "marked" depends not on the specific amount of impaired behaviors, but the nature and overall degree of interfered functioning. *Id.*

The ALJ found that, in regard to social functioning, "the claimant has mild difficulties." (Decision at p. 4). He reasoned: "claimant indicated that he regularly spent time with others and he did not need someone to accompany him when he went out." (*Id.*). In support of this observation, the ALJ again cited Mr. Coleman's Function Report. But again, the actual content of Mr. Coleman's report does not fully support the ALJ's conclusion. Under "social activities," in answer to the question "list the places you go on a regular basis," the only thing Mr. Coleman reported was "corner of East Jersey." The "kinds of things" he does with others, he said, were "talk" "take walk" and "look at tv," in addition to, apparently, starting arguments. (Record at 153). Such evidence does not go far toward satisfying the substantive standard set forth above.

The other evidence in the record is mixed. There is evidence to support the ALJ's finding, which the ALJ simply failed to cite. There is also contrary evidence, which the ALJ should have considered and explicitly rejected before arriving at his conclusion.

For example, Plaintiff, in that same September 2009 self-report, wrote that he "rebels against authorities" in answer to a question concerning how he get gets along with "authority figures" like "police, bosses, landlords or teachers." (Record at 155). He also indicated that for at least half the day he watches TV and stares at people. (*Id.* at 152). In describing what he does during his waking hours, he did not list socializing, but only watching tv, praying, and contemplating. (*Id.* at 149). Then, in his December 2010 testimony, Coleman said that he doesn't really keep up with any friends, but sticks to his family. He did not describe any particular problems in getting along with people, just a definite unwillingness to keep up with or foster new friendships, or to leave the home very often. (Transcript of Hearing [ECF No. 7-2] at 13).

Looking beyond Plaintiff's self-reporting, Dr. Thomas Rohde observed in 2007 that one of Plaintiff's psychological stressors was a "lack of social support." (DSM IV Multiaxial Evaluation (Record at 185)). Also in 2007, upon

12

intake to Trinitas Hospital, a clinician summarized his assessment of Plaintiff's "interpersonal/social skills" as "moderately," as opposed to "seriously" or "mildly," impaired. (Intake Assessment 6/1/07 (Record at 254)).

In July 2009 Dr. Silikovitz described Plaintiff as friendly, cooperative, and conversational, and relayed Mr. Coleman's report that his average day consisted of taking his kids to and from school, sometimes visiting his brothers in Newark, and talking to neighbors for an hour or two. (Record at 213-215). Thus, despite his "bipolar disorder, mixed, moderate to severe, with psychotic features," Mr. Coleman was socially functional at least to some extent, with no reports of antagonistic or particularly anti-social behavior. (*Id.*).

Amid this contradictory record, it is problematic that there is no assessment of Plaintiff's social skills from Dr. Gorman, his treating physician. Gorman's colleague Marc Schiffman, however, remarks that Plaintiff "active[ly] participat[ed]" in group therapy as part of his treatment under Gorman. (*See* Progress Notes (Record at 260, 263, 265, 270, 271)).

I do not determine whether the substantial evidence supports the ALJ's finding on this prong. The ALJ decision's lack of explicit reasoning and failure to discuss and deal with contrary evidence constitute error in their own right, and the record is underdeveloped. Perhaps most helpful would be an opinion from the treating physician regarding Plaintiff's social skills. These factors all weigh in favor of remand for further proceedings.

### 3. *Marked difficulties in maintaining concentration, persistence, or pace*

This prong refers to the "ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." *See* Appendix 1 at 12.00(C)(3). Observations concerning this are to come from the work setting, though clinical and psychological testing, supplemented with other evidence, may be used. *Id.* One test is "having you subtract serial sevens or serial threes from 100." *Id.* The point is to assess the applicant's ability to complete *simple* tasks at a consistent pace without unreasonable rest periods, without extra supervision, *and* without undue interruption or distraction. *Id.*

The ALJ found that "the claimant has moderate difficulties. The claimant notes that he could only maintain attention for about 10 minutes, but he could follow both oral and written instructions fairly well." (Decision at 4). The factors noted by the ALJ—attention span and ability to follow directions—are not among those listed in the Appendix. *See* Appendix 1 at 12.00(C)(3). There is no further discussion or analysis of this prong in the ALJ decision.

Looking at the record as a whole, I note a great deal of contrary evidence which the ALJ did not weigh, discuss, or explicitly reject. In his Function Report, Plaintiff described his inability to "understand certain simple things,"

13

"pay attention," and complete tasks. (Record at 150, 153). The ALJ decision quotes selectively from Plaintiff's Function Report, and glosses over the fact that Plaintiff's reported 10-minute attention span appears to hamper his ability to complete and understand tasks. (*See id.*).

Further, there is Dr. Silikovitz's 2009 report, which notes that Plaintiff could complete, but struggled with, the 'serial sevens' exercise, and that despite his "good eye contact and concentration," his GAF was a paltry 37 and his prognosis was "fair to poor." (Record at 214, 216). The treating physician, Dr. Gorman, stated that Plaintiff is unable to work and has been stabilized by a regimen of four specified medications. (Record at 262, 269). Aside from that conclusion, there is nothing from Dr. Gorman's concerning concentration, persistence, or pace.

Finally, there is Plaintiff's testimony, at the December 2010 hearing, that he had lost practically all of his ability to concentrate, (Transcript at 9). He repeated this observation in his request for reconsideration following the Commissioner's denial of benefits. (*See* August 3, 2009 Request for Reconsideration (Record at 51)).

The analysis in the ALJ decision falls short of a reasoned decision addressing or rejecting contrary evidence. And, again, the record seems undeveloped, in that the opinion of the treating physician does not address certain necessary factors or explain why they are not addressed.

### 4. Repeated episodes of decompensation, each of extended duration

This prong of 12.04(B)(4), when read together with the definitions in 12.00 of the Appendix, requires evidence of "three episodes [of decompensation] within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." (*Id.* at 12.00(C)(4)). The regulation adds: "If you have experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, we must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listing finding[.]" (*Id.*). Here, the ALJ decision, without discussion, analysis or review of the record, simply states that "the claimant has experienced no episodes of decompensation, which have been of extended duration." (Decision at 4). This perhaps is an implicit finding that there is no evidence of decompensation lasting more than two weeks; if so, however, it fails to deal with considerable contrary evidence.

Plaintiff has clearly had several episodes of decompensation—going by the records of his roughly half-dozen hospitalizations,[2] if nothing else—but it is

---

[2] I note that hospitalizations are not the exclusive indicia of decompensation, so on remand that ALJ should not limit their analysis to evidence of Plaintiff's hospitalizations. *See* 20 CFR 404 Subpart P Appendix 1 at 12.00(C)(4).

14

unclear what metric, if any, the ALJ used to measure the all-important duration of the episodes. The regulations require an analysis of when each episode began and ended, but the decision does not do so. In short, the ALJ decision does not set forth the basis for the finding in light of the standards set forth in the pertinent regulation. In addition, the record needs to be further developed so that the duration of Plaintiff's episodes can be known and the required frequency:duration analysis can be conducted. Once again, these shortcomings merit remand so that further evidence can be adduced and properly weighed in accordance with Appendix 1.

Overall, then, the ALJ's Step Three findings are all based on insufficient analysis and accompanied by inadequate statements of reason. Further, the first prong of the Step Three analysis is clearly not supported by substantial evidence, and the second through fourth prongs all require a more complete evidentiary record. I will therefore reverse the ALJ's Step Three findings and remand for additional proceedings in accordance with this opinion.

**Steps Four and Five**

The missteps in the ALJ's Step Three analysis, standing alone, warrant a remand. For guidance, however, I will more briefly discuss Steps Four and Five.

At Step 4, the ALJ must: "determine the claimant's residual functional capacity" ("RFC"), that is to say, the claimant's "ability to do physical and mental work activities on a sustained basis despite limitations from his impairments (both severe and non-severe)." 20 CFR 404.1520(e), 416.920(e), 404.1545, 416.945. Step 4 requires an additional determination whether the claimant, given his RFC, can perform the requirements of his past work, either as he actually performed it or as it is generally performed in the national economy. 20 CFR 404.1520(d); 404.1560(b); 404.1565; 416.960(b); 416.920(f); 416.965.

If the claimant is found to lack the RFC to perform any of his past work, then the ALJ must consider the Step 5 question: whether the claimant is able to do any other work, considering his RFC, age, education and work experience. The Commissioner has the burden of providing evidence demonstrating such other work exists in significant numbers in the national economy. *See* 20 CFR 404.1520(g); 416.920(g); 404.1512(g); 404.1560(c); 416.912(g); 416.960(c).

1. *The RFC Finding*

The ALJ decision contains a finding that "claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is able to maintain pace, persistence, and concentration in simple routine tasks and is able to relate appropriately to coworkers and the public." In coming to this conclusion,

the ALJ relied on evidence that Coleman's mood was generally neutral and his memory intact, according to treating physicians; that claimant was not actively psychotic; and that claimant could help take care of kids, "go shopping," and do some house chores. The ALJ noted but gave less weight to the various diagnoses of moderate to severe bipolarity, the GAFs below 50, and Coleman's various statements (on forms and in testimony) that he could not concentrate, could not sleep, and suffered from poor memory and depression making it hard to perform his daily activities. (Decision at 5-7). He did not address or give any weight to, among other things, the statements of plaintiff which, as stated under my analyses of Step Three, Prong One *supra*, are evidence of a marked limitation in daily activities. In this way, the ALJ's RFC analysis suffers from some of the same basic flaws as the Step Three analysis.

The ALJ's RFC finding runs counter to the regulation's requirement that "all relevant evidence in [the] case record" be assessed in the RFC analysis, including "descriptions and observations of your limitations...provided by you..." *See* 20 CFR 404.1545 (a)(1), (3). It also goes against the general requirements for considering all evidence and providing a reasoned rejection of probative evidence, as described *supra*. *See Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994) (the Commissioner "must provide some explanation for a rejection of probative evidence which would suggest a contrary disposition."). Although the ALJ explains that he discounts Plaintiff's self-described limitations as "not credible to the extent they are inconsistent with the above residential functional capacity assessment," (Decision at 5), he provides no reasoning to support this rejection. The fact that Plaintiff's first-hand version of the facts is inconsistent with the ALJ's conclusion, standing alone, is not a proper, reasoned basis for discounting such evidence.

The ALJ's RFC finding also lacks the support of substantial evidence. I do not think that the medical observations about Plaintiff's overall stability and mental intactness are particularly probative of whether and what type of work he can accomplish. The fact that he was not actively psychotic when examined says little about his ability to focus and follow directions for any period of time. Any effect of this evidence is diminished further by the numerous below-50 GAF scores, and by the conclusion of Dr. Gorman that Plaintiff is unable to work.

### 2. The Finding that Plaintiff is Able to Work

The ALJ decision concludes with a combined step four and five analysis. First, to round out step four, the ALJ finds in the course of three sentences that "claimant is capable of performing past relevant work as a crane operator and laborer." The ALJ also performs the Step Five analysis and finds that "there are other jobs existing in the national economy that he is able to perform." (Decision at 7-8). The decision essentially concludes that Mr.

Coleman's "nonexertional" limitations do not prevent him from work at a job with "simple routine tasks." (*Id.*).

These findings lack a proper, articulated and reasonable basis. The first finding is purely conclusory and does not contain the required comparison of specific job requirements to the evidence of medical limitations. *See Stevenson v. Heckler,* 624 F. Supp. 1189, 1191 (E.D. Pa. 1986) ("the ALJ should make explicit findings as to what lifting tasks were necessary in [claimant]'s job and whether he can perform those tasks."); *Ingram v. Comm'r of Soc. Sec.,* 2011 U.S. Dist. LEXIS 72550 (D.N.J. July 6, 2011) ("Plaintiff points to Social Security Ruling 82-62 which states, '[d]etermination of the claimant's ability to do past relevant work requires a careful appraisal of (1) the individual's statements as to which past work requirements can no longer be met and the reasons behind this inability, (2) medical evidence establishing how the impairment limits ability to meet the physical and mental requirements of the work, and (3) in some cases, supplemental corroborative information from other sources such as employers on the requirements of the work as generally performed in the economy.'"). The decision on remand should state how the job of 'crane operator' is consistent with Plaintiff's "nonexertional limitation," under which he can do only simple, routine tasks, and the concerns (if only for safety) imposed by limitations on Plaintiff's ability to maintain focus.

The ALJ's analysis of Step Five was understandably cursory, as it was done "in the alternative" for the sake of completeness. As to that step, where a claimant, like Mr. Coleman, suffers from solely nonexertional limitations, the ALJ must adduce testimony from a vocational expert, or give notice that he is not going to rely on a vocational expert, and also, if he instead chooses to rely on a Social Security Ruling, "it must be crystal-clear that the SSR is probative as to the way in which the nonexertional limitations impact the ability to work, and thus, the occupational base." *Allen v. Barnhart,* 417 F.3d 396, 406-407 (3d Cir. 2005). If, on remand, the ALJ arrives at Step Five, the analysis should comport with the requirements set forth in *Allen v. Barnhart.*

In sum, the Step Four and Five analyses of the ALJ are not adequately supported by substantial evidence, and are procedurally flawed, as outlined above.

17

## CONCLUSION

In accordance with the findings above, I will **AFFIRM** the ALJ's findings at Step One. As to Step Two, I will **REMAND** for further findings and clarification as appropriate. As to Steps Three, Four and Five, I will **REVERSE** the ALJ's findings and **REMAND** this matter for a new hearing consistent with this opinion. An appropriate order follows.

_____
HON. KEVIN MCNULTY
United States District Judge

Dated: May 14, 2014
Newark, New Jersey